Henry GELLER, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

American Broadcasting Companies, Inc., Intervenor.

No. 77–1093.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 23, 1978.

Decided Nov. 7, 1979.

Edward J. Kuhlmann, Washington, D. C., for petitioner.

Julian R. Rush, Jr., Counsel, Washington, D. C., with whom Werner K. Hartenberge, Gen. Counsel, and Daniel M. Armstrong, Asst. Gen. Counsel, Federal Communications Commission, and John H. Shenefield, Acting Asst. Atty. Gen., Barry M. Grossman, and Peter L. Delacruz, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondents.

James A. McKenna, Jr., Robert W. Coll and John J. Smith, Washington, D. C., entered appearances for intervenor American Broadcasting Companies, Inc.

Before WRIGHT, Chief Judge, and ROBINSON and WILKEY, Circuit Judges.

Opinion per curiam.

PER CURIAM:

The pivotal question before us is whether regulations of the Federal Communications Commission initially promulgated to facilitate the enactment of new copyright legislation can, once that purpose has been fully exploited, subsist without a fresh determination that they serve the public interest in some other manner. We answer that question in the negative.

## I

After years of inconclusive effort to define a satisfactory relationship between broadcasting and cable[1] in the provision of television programming,[2] the Commission in 1971 issued a "Letter of Intent"[3] incorporating a "summary of the Commission's proposals for the near-term regulation of cable television."[4] This pronouncement adverted to a careful three-year revision of the Commission's earlier cable policies, and declared that "[t]he policies put forward here result from an intensive study of the issues, balancing all the equities, and represent our best judgment on the regulatory course that should be followed."[5] The letter of intent expressed the view that new copyright legislation was needed[6] in order to insure "the continued economic health of those who create program material," a matter deemed "crucial to both broadcasting

---

1. For the statutory basis for Commission regulation of cable television, see *United States v. Southwestern Cable Co.*, 392 U.S. 157, 167–178, 88 S.Ct. 1994, 1999–2000, 20 L.Ed.2d 1001, 1010–1016 (1968).

2. See, *e. g.*, LaPierre, *Cable Television and the Promise of Programming Diversity*, 42 Fordham L.Rev. 25, 36–59 (1973).

3. *Commission Proposals for Regulation of Cable Television*, 31 F.C.C.2d 115 (1971) [hereinafter cited as *Letter of Intent*]. This was a report to Senator John O. Pastore, Chairman of the Senate Communications Subcommittee of the Senate Committee on Interstate and Foreign Commerce, and to Representative Torbert H. MacDonald, Chairman of the House Subcommittee on Communications and Power of the House Committee on Interstate and Foreign Commerce.

4. *Letter of Intent, supra* note 3, 31 F.C.C.2d at 115.

5. *Id.*

6. *Id.* The Copyright Act of 1909, 35 Stat. 1075, as amended, 17 U.S.C. §§ 1 *et seq.*, had been held inapplicable to community antenna cable television systems. *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). There the Court ruled that cable television systems do not "perform" copyrighted works within the meaning of §§ 1(c) and (d) of the Act. Although prior judicial construction of the 1909 Act had resulted in the treatment of broadcasters as "performers," the Court concluded that cable systems merely enhance the capacity of viewers to receive broadcast signals and therefore do not "perform" the programs they intercept and carry. *Id.* at 398–400, 88 S.Ct. 2084. Subsequent to the Commission's letter of intent, the Court held this interpretation of the Copyright Act of 1909 applicable to cable systems designed to receive and retransmit distant signals ordinarily unavailable to local viewers, as well as to community antenna cable operators. *Teleprompter Corp. v. Columbia Broadcasting Sys., Inc.*, 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974). The consequence of these two cases was thus to place existing types of cable television systems beyond the reach of the 1909 copyright laws.

and cable." [7] The Commission felt, however, that cable regulation and copyright protection could be separately considered,[8] and "that copyright policy is most appropriately left to Congress and the courts." [9] The Commission "note[d] the present efforts of the principals [in the controversy] to reach an agreement," and "hope[d] that these efforts [would] be fruitful." [10]

Subsequently, the three major groups to be affected by the contemplated rules—broadcasters, cable operators and copyright owners—entered into a consensus agreement [11] proposing three modifications in regulations envisioned in the letter of intent with respect to cable carriage of television broadcast signals.[12] The Commission, in turn, "believe[d] that adoption of the consensus agreement [would] markedly serve the public interest." [13] This belief was founded on the expectation that adoption of the proposed modifications would facilitate the passage of new copyright legislation and the realization of the benefits anticipated therefrom.[14] On this public-interest ground the Commission in 1972 chose the specifications of the consensus agreement in lieu of differing provisions of the letter of intent.[15] Late in 1976,

7. *Letter of Intent, supra* note 3, 31 F.C.C.2d at 115.

8. *Id.* at 116.

9. *Id.* at 115–116. The Commission added that it "intend[ed], however, to keep a close watch on how the new regulatory program detailed [therein] works out, and to revisit the copyright question within two years if the problem has not in the meantime been resolved." *Id.* at 116.

10. *Id.*

11. *Cable Television Report & Order*, 36 F.C.C.2d 143, 165 (1972).

12. The modifications proposed in the consensus agreement dealt with television broadcast signal carriage, the subject of Part I of the Commission's letter of intent. The suggested changes were described by the Commission as follows:

(i) *Exclusivity.* For syndicated programming, the agreement provides for extensive exclusivity in the top 50 markets, and more limited exclusivity in markets 51–100. For network programming, it substitutes simultaneous for same-day protection.

(ii) *Local signals.* The agreement changes the significant viewing standard applied to out-of-market independent stations in overlapping market situations from a one percent share of viewing hours to a two percent share; it does not alter the standard applied to network affiliates.

(iii) *Leapfrogging.* The agreement retains a UHF priority where a third distant signal is carried but changes the requirements for the first two signals. There is no restriction on these signals as to point of origin, except that if either is taken from any of the top 25 markets it must be from one of the two closest such markets. In the August 5 Letter these signals were, in effect, channels of independent programming (conceivably a blend of several distant stations); now they are restricted to specified distant stations except during exclusivity protection periods. *Id.* at 166.

13. *Id.*

14. In its entirety, the Commission's exposition on this score was as follows:

(i) First, the agreement will facilitate the passage of cable copyright legislation. It is essential that cable be brought within the television distribution market. There have been several attempts to do so, but all have foundered on the opposition of one or more of the three industries involved. It is for this reason that Congress and the Commission have long urged the parties to compromise their differences.

(ii) Passage of copyright legislation will in turn erase an uncertainty that now impairs cable's ability to attract the capital investment needed for substantial growth. The development of the industry, at least with respect to assessing copyright costs, would be settled by the new copyright legislation and its future no longer tied to the outcome of pending litigation.

(iii) Finally, the enactment of cable copyright legislation by Congress—with the Commission's program before it—would in effect reaffirm the Commission's jurisdiction to carry out that program, including such important features as access to television facilities. It is important to emphasize that for full effectiveness the consensus agreement requires Congressional approval, not just that of the Commission. The rule will, of course, be put into effect promptly. Without Congressional validation, however, we would have to re-examine some aspects of the program. Congress, we believe, will share our conclusion that implementation of the agreement clearly serves the public interest. *Id.* at 166–167. (footnote and citation omitted).

15. *Id.* at 167, 211. See note 12 *supra*.

Congress revised the copyright laws extensively.[16]

Meanwhile, in 1974, Henry Geller, the petitioner here, asked the Commission to reexamine portions of the cable television rules and to revamp them suitably,[17] in significant part by returning to particular regulatory provisions of the letter of intent that had been supplanted in the preference for the consensus agreement.[18] Prominent among Geller's complaints were contentions "that the Commission's 1972 cable television rules were in important respects not based on the Commission's judgment as to what would best serve the public interest, but rather on the need to adhere to the "Consensus Agreement," [19] and "that the Commission can no longer validly adhere to provisions that do not, in its judgment, best serve the public interest in view of 'the undisputed fact that the agreement is now a dead letter.' " [20] These arguments did not impress the Commission however. While, stating that it was "open to proposals for changes in [its] cable television rules," [21] and that "[a]dditional changes in the rules [could] be anticipated in response to properly documented petitions for rulemaking or as part of [its] own continuing review of the rules," [22] the Commission concluded that Geller's petition did not "provide[ ] an appropriate vehicle for initiating further changes." [23] Although it emphasized that

past rulings clearly established that the consensus agreement interposed no barrier to modification of rules emanating from it,[24] the Commission perceived no occasion to reassess their validity on the basis of Geller's petition:

> It was the Commission's judgment in 1972 that it would be in the overall public interest to adopt rules that closely followed the "Consensus Agreement"—that such rules not only served to protect the television broadcaster serving the public receivers but held forth the best prospect of fostering cable television growth within an appropriate and fair regulatory and legal context. The question for us now is whether all of the regulations adopted at that time remain justified. Although we are not prepared at this time to say they are contrary to the public interest, all of the rules are under review as part of our continuing re-regulation efforts. The petitions before us do not contain any evidence that aids us in making that judgment. We will, therefore, not institute the requested rulemaking proceedings at this time. Our overall review will continue, however, and we will remain receptive to properly documented suggestions for rule changes.[25]

Then followed the petition for review now before us.[26]

---

16. Pub.L.No.94–553, 90 Stat. 2541 (1976), 17 U.S.C.App. §§ 101 *et seq.* (1976).

17. *Revision of Cable Television Rules Regarding Leapfrogging, Carriage of Local Independent Signals, and Non-Network Programming Exclusivity,* 62 F.C.C.2d 192 (1976) [hereinafter cited as *Revision of Cable Television Rules* ].

18. Petitioner Geller
 request[ed] that the Commission adopt leapfrogging rules of the type proposed in its August 5, 1971 "letter of intent," return to the independent signal "significant viewing" definition used in the "letter of intent," delete the syndicated program exclusivity rules in markets 51–100, and explore a modified version of the proposed 1968 retransmission consent requirement.
 *Id.* (footnote omitted).

19. *Id.* at 193.

20. *Id.*

21. *Id.* at 194.

22. *Id.* at 195.

23. *Id.*

24. *Id.*

25. *Id.* at 195–196. Another petition for rulemaking, filed by the National Association of Broadcasters, was similarly denied. *Id.* at 196. That action is not presented for review.

26. Geller resides in Washington, D. C., a major market, and thus is susceptible to the impact of regulations impeding the growth of cable television therein. He proceeded before the Commission *pro se* pursuant to § 1.401 of its rules, 47 C.F.R. § 1.401 (1974). *Revision of Cable Television Rules, supra* note 17, 62 F.C.C.2d at 192. Although neither there nor here has any challenge to his standing emerged, we are satisfied that he has standing. *United States v.*

## II

[1] We are confronted at the threshold by a jurisdictional problem. In this court Geller contends for the first time that the Commission erred when in 1972 it translated the regulatory modifications urged in the consensus agreement into rules for the governance of cable television. Geller charges that in so doing the Commission baldly adopted the compromise reached by the three involved industries on the controversy long besetting cable television, without providing other segments of the interested public with any opportunity for input into the decision to be made.[27] Geller argues further, again for the first time, that the Commission's acceptance of the industry compact could not have been justified by the supposed need to facilitate the passage of new copyright legislation.[28] Not only

are these arguments inappropriate for judicial consideration in the first instance[29] but they are also grossly untimely. Direct review of Commission orders must be initiated within a period of 60 days;[30] here the interval between finality of the rulemaking order and the instant petition for judicial review was almost five years.[31] Resultantly, we lack jurisdiction to consider so much of Geller's presentation.[32]

■ It does not follow, however, that Geller is completely out of court, for his challenge to the continuing vitality of the Commission's public-interest justification remains. The claim that the 1972 rule changes had fully served their stated purpose did not ripen until the new copyright legislation was enacted—just six weeks prior to the order denying Geller's request for additional rulemaking.[33] Moreover, in

SCRAP, 412 U.S. 669, 683–690, 93 S.Ct. 2405, 2414–2417, 37 L.Ed.2d 254, 268–271 (1973); *Committee for Open Media v. FCC*, 177 U.S. App.D.C. 376, 379–380 n.20, 543 F.2d 861, 864–865 n.20 (1976); *Hale v. FCC*, 138 U.S.App. D.C. 125, 425 F.2d 556 (1970); *Office of Communication of United Church of Christ v. FCC*, 123 U.S.App.D.C. 328, 334–340, 359 F.2d 994, 1000–1006 (1966).

27. Brief for Petitioner at 22–25.

28. Brief for Petitioner at 20–22.

29. Communications Act of 1934, § 405, 47 U.S.C. § 405 (1976); *Alianza Fed. de Mercedes v. FCC*, 176 U.S.App.D.C. 253, 260, 539 F.2d 732, 739 (1976); *Pacific & S. Co. v. FCC*, 132 U.S.App.D.C. 101, 102, 405 F.2d 1371, 1372 (1968); *Community Broadcasting Serv. v. FCC*, 126 U.S.App.D.C. 258, 259, 377 F.2d 143, 144 (1967); *WLIL, Inc. v. FCC*, 122 U.S.App.D.C. 246, 250, 352 F.2d 722, 726 (1965). Geller seeks to avoid the consequences of his failure first to present these contentions to the Commission by reminding this court that Commissioner Johnson advanced similar points in his dissenting opinion in the 1972 proceeding. *Cable Television Report & Order, supra* note 11, 36 F.C.C.2d at 306. We have held that arguments raised by dissenting commissioners could properly be brought before this court in an action for judicial review, even though neither party had pressed such arguments before the Commission. *Office of Communication of United Church of Christ v. FCC*, 150 U.S.App.D.C. 339, 343, 465 F.2d 519, 523 (1972). When an administrative decision is made, there is a strong presumption that the officials who espouse the

majority position have conscientiously considered the views of their colleagues. *Braniff Airways, Inc. v. CAB*, 126 U.S.App.D.C. 399, 406, 379 F.2d 453, 460 (1967). The dissenting opinion relied on by Geller, however, was part of an entirely separate proceeding in which petitioner did not participate. The Commission could not have been fairly on notice when Geller made his 1974 rulemaking request that it must deal with arguments long since presumably laid to rest. Moreover, in his rulemaking petition Geller specifically informed the Commission that he was "not attacking the validity of the Commission's decision in 1972 to adopt the provisions of the consensus agreement." Joint Appendix 117.

30. 28 U.S.C. § 2344 (1976).

31. The regulations under attack were promulgated on February 3, 1972, and generally affirmed on reconsideration on June 16, 1972. Geller's petition for review—styled as a petition for review of the Commission's November 30, 1976, denial of his November 27, 1974, request for rulemaking—was filed in this court on January 19, 1977.

32. *Microwave Communications, Inc. v. FCC*, 169 U.S.App.D.C. 154, 158–159, 515 F.2d 385, 389–390 (1974); *Chem-Haulers, Inc. v. United States*, 536 F.2d 610, 613–614 (5th Cir. 1976); *B. J. McAdams, Inc. v. ICC*, 551 F.2d 1112, 1114 (8th Cir. 1977).

33. The date of enactment of the new copyright legislation, Pub.L.No.94–553, 90 Stat. 2541 (1976), 17 U.S.C.App. §§ 101 *et seq.* (1976), was

*Functional Music, Inc. v. FCC,*[34] we found jurisdiction to consider, in a proceeding not begun until late 1957, the validity of Commission regulations formulated in 1955. We explained:

> As applied to rules and regulations, the statutory time limit restricting judicial review of Commission action is applicable only to cut off review directly from the order promulgating a rule. It does not foreclose subsequent examination of a rule where properly brought before this court for review of further Commission action applying it. For unlike ordinary adjudicatory orders, administrative rules and regulations are capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity.[35]

Had the Commission applied one or more of the 1972 regulations to the detriment of some individual, he would clearly have been in a position to complain of the order doing

so. Had Geller emulated *Functional Music* in an unsuccessful petition to eliminate specific regulations on demonstrable grounds of invalidity, his right to judicial review seemingly would be unquestionable. Although, in this case, Geller asked the Commission to commence a new rulemaking proceeding,[36] the same result must follow. *Functional Music* makes clear that the period statutorily prescribed for judicial review of an administrative order governs only direct review of that order.[37] Geller's petition in this court is for review, not of the 1972 order promulgating the contested rules, but of the 1976 order refusing to reexamine their continuing validity.[38] To this extent, we have jurisdiction to entertain his complaint.[39]

## III

In denying Geller's petition for new rulemaking, the Commission stated, very accurately in our view, that "[t]he question for [decision was] whether all of the regulations

October 19, 1976. The Commission denied Geller's petition on November 30, 1976.

**34.** 107 U.S.App.D.C. 34, 274 F.2d 543 (1958), *cert. denied,* 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959).

**35.** *Id.* at 37, 274 F.2d at 546. Accord, *Investment Co. Inst. v. Board of Governors of Fed. Reserve Sys.,* 179 U.S.App.D.C. 311, 321–322, 551 F.2d 1270, 1280–1281 (1977) ("[w]here the right to petition for review within 30 days after promulgation of a regulation does not provide an adequate remedy, alternative means may be utilized to bring a claim before this court. . . . For example, if a regulation does not become ripe for review within 30 days, an aggrieved party can wait until sufficient information as to the regulation's concrete effect is available, petition the Board for reconsideration of the regulation on the basis of the new information, and seek review of the Board's decision in this court. Administrative Procedure Act § 4(d), 5 U.S.C. § 553(e) (1970)").

**36.** The Administrative Procedure Act, § 4(d), specifies that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e) (1976).

**37.** See text *supra* at note 35.

**38.** True it is that we have suggested "that those who have had the opportunity to challenge general rules should not later be heard to complain of their invalidity on grounds fully known to them at the time of issuance." *Outward Continental N. Pac. Freight Conference v. FMC,* 128 U.S.App.D.C. 199, 200–201 n.3, 385 F.2d 981, 982–983 n.3 (1967). See also *Pacific Coast European Conference v. FMC,* 126 U.S.App.D.C. 230, 232–233 & n.4, 376 F.2d 785, 787–788 & n.4 (1967). But, as we have noted, the claim that passage of new copyright legislation fatally undermined the Commission's public-interest justification for the regulations in question did not mature until long after completion of the administrative proceeding from whence they emanated, and indeed until shortly before Geller's own proceeding ended. See note 33 *supra* and accompanying text.

**39.** Since, as we later hold, the Commission had an affirmative duty to ascertain whether the involved regulations still served some aspect of the public interest, see Part III *infra,* we are not faced by the problems incidental to judicial reviewability of *discretionary* agency refusals to adopt new rules or to alter old ones. See *Natural Resources Defense Council v. SEC,* 196 U.S.App.D.C. 124, 136–140, 606 F.2d 1031, 1043–1047 (1979).

adopted [in 1972] remain[ed] justified." [40] Although the Commission was "not prepared at [that] time to say they [were] contrary to the public interest," [41] it plainly was equally unprepared to say that the regulations were then consistent with the public interest.[42] Nonetheless, the Commission declined to conduct an inquiry in that regard because "[t]he petitions before [it did] not contain any evidence that aid[ed it] in making that judgment." [43]

Undeniably, an agency normally possesses a generous measure of discretion respecting the launching of rulemaking proceedings.[44] But though the discretion typically is broad, its exercise is reviewable if plainly misguided.[45] Already this court has twice applied that principle to vacate agency orders rejecting requests for rulemaking on the mistaken ground that the agency lacked jurisdiction to promulgate the regulations proposed.[46] And it goes without saying that the agency cannot sidestep a reexamination of particular regulations when abnormal circumstances make that course imperative.[47] That, we think, was the situation

here. While the procedural vehicle Geller utilized was a petition for rulemaking, the far more important fact was that its allegations served to alert the Commission to the possibility that the regulations imported from the consensus agreement lacked a nexus with the public interest once the sought-after revision of the copyright laws was accomplished.[48]

The relevant circumstances were rather clear to all. In 1972, the Commission had stated what from its viewpoint the public interest demanded in several aspects of cable television policy.[49] Some of the regulations that were to effectuate this public-interest determination were sacrificed to modifications proposed by the consensus agreement in a bid to facilitate the passage of copyright legislation.[50] From late 1976 onward, however, once that objective was achieved,[51] this rationale could no longer support the rules derived from the agreement. Yet the Commission, despite previous assurances to the contrary,[52] continues to adhere to the rules adopted on the basis of the consensus agreement—rules that it

---

**40.** *Revision of Cable Television Rules, supra* note 17, 62 F.C.C.2d at 196.

**41.** *Id.*

**42.** For the Commission's full statement at this point, see note 25 *supra.*

**43.** *Revision of Cable Television Rules, supra* note 17, 62 F.C.C.2d at 196.

**44.** *E. g., Action for Children's Television v. FCC,* 183 U.S.App.D.C. 437, 459, 564 F.2d 458, 479 (1977).

**45.** *Scanwell Laboratories v. Shaffer,* 137 U.S. App.D.C. 371, 386, 424 F.2d 859, 874 (1970).

**46.** See *NAACP v. FPC,* 172 U.S.App.D.C. 32, 46–47 & n.53, 520 F.2d 432, 446–447 & n.53 (1975), *aff'd,* 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976); *National Organization for Reform of Marijuana Laws v. Ingersoll,* 162 U.S.App.D.C. 67, 497 F.2d 654 (1974).

**47.** See S.Doc.No.248, 79th Cong., 2d Sess. 201–202 (1946) ("the facts or considerations brought to the attention of an agency by . . . a petition [for rulemaking] might be such as to require the agency to act to prevent the rule from continuing or becoming vulnerable upon judicial review").

**48.** See text *supra* at notes 19–20.

**49.** See text *supra* at notes 11–15 and notes 12, 14 *supra.*

**50.** See text *supra* at notes 1–5.

**51.** See text *supra* at note 16.

**52.** For example, at the time the modifications proposed in the consent agreement were adopted the Commission stated:

There remains the question of the effect of the consensus agreement on the Commission's flexibility to shape cable's evolution. Our judgment is, to repeat, that the agreement serves the public and should thus be reflected in the rules here adopted. The legislation that we believe must follow will limit the number of distant signals to which compulsory copyright licenses apply. . . . In all other respects—for example, the details of network and syndicated programming exclusivity protection, leapfrogging, the significant viewing standard, the definition of signals that must be carried—*the Commission retains full freedom and, indeed, the responsibility to act as future developments warrant.*

*Cable Television Report & Order, supra* note 11, 36 F.C.C.2d at 167 (emphasis supplied).

has never found to serve the public interest in any other way.

 What we have, then, are cable television rules that may or may not presently square with the public interest. Even assuming that the rules in question initially were justified by the aid the Commission expected them to afford to enactment of the copyright legislation—a question we do not decide [53]—it is plain that that justification has long since evaporated. The Commission's general rulemaking power is expressly confined to promulgation of regulations that serve the public interest; [54] it "must place the public interest above private interests in carrying out its duties." [55]

And, as the Second Circuit has so well put it, "[t]he Commission may reach compromises, . . . but it may not simply compromise between the interests of different broadcasting groups and gloss over the more fundamental public interest." [56] Even a statute depending for its validity upon a premise extant at the time of enactment may become invalid if subsequently that predicate disappears.[57] It can hardly be supposed that the vitality of conditions forging the vital link between Commission regulations and the public interest is any less essential to their continuing operation.[58] We hold that the Commission is statutorily bound to determine whether that linkage now exists.[59]

---

**53.** See text *supra* at notes 29–32.

**54.** Federal Communications Act of 1934, § 303(r), 47 U.S.C. § 303(r) ("[e]xcept as otherwise provided in this chapter, the Commission from time to time, *as public convenience, interest, or necessity requires*, shall . . . [m]ake such rules and regulations . . ., not inconsistent with law, as may be necessary to carry out the provisions of this chapter . . . .") (emphasis supplied); see *FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 793, 98 S.Ct. 2096, 2111, 56 L.Ed.2d 697, 713 (1978); *National Broadcasting Co. v. United States*, 319 U.S. 190, 214–217, 63 S.Ct. 997, 1008–1010, 87 L.Ed. 1344, 1361–1363 (1943); *Office of Communication of United Church of Christ v. FCC, supra* note 29, 150 U.S.App.D.C. at 344–347, 465 F.2d at 524–525; *WAIT Radio v. FCC*, 135 U.S.App.D.C. 317, 321, 418 F.2d 1153, 1157 (1969), quoted *infra* note 58.

**55.** *National Ass'n of Independent Television Producers & Distribs. v. FCC*, 502 F.2d 249, 257 (2d Cir. 1974) (citations omitted).

**56.** *Id.* at 257–258 (citations omitted). Consequently, the Commission put the shoe on the wrong foot when it observed that Geller's petition for rulemaking "do[es] not contain any evidence that aids" the public-interest determination. Text *supra* at note 25.

**57.** *E. g., Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547–548, 44 S.Ct. 405, 406, 68 L.Ed. 841, 843 (1924).

**58.** Compare *WAIT Radio v. FCC, supra* note 54, where, speaking of the occasional need for rule waivers, we admonished:

The Commission is charged with administration in the "public interest." That an agency may discharge its responsibilities by promul-

gating rules of general application which, in the overall perspective, establish the "public interest" for a broad range of situations, does not relieve it of an obligation to seek out the "public interest" in particular, individualized cases. A general rule implies that a commission need not re-study the entire problem de novo and reconsider policy every time it receives an application for waiver of the rule. On the other hand, a general rule, deemed valid because its overall objectives are in the public interest, may not be in the "public interest" if extended to an applicant who proposes a new service that will not undermine the policy, served by the rule, that has been adjudged in the public interest.

135 U.S.App.D.C. at 321, 418 F.2d at 1157. See also *Environmental Defense Fund v. HEW*, 138 U.S.App.D.C. 381, 390, 428 F.2d 1083, 1092 (1970). With an interrelationship between Commission rules and the public interest statutorily mandated, we think the need to revisit the regulations contested here is no less inexorable. In that view, we do not encounter the strictures on imposition of judicially-created requirements on the rulemaking process recently highlighted in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 542–549, 98 S.Ct. 1197, 1211–1214, 55 L.Ed.2d 460, 478–483 (1978).

**59.** We do not mean to imply that this inquiry must necessarily be conducted in a new rulemaking proceeding, as requested by Geller, so long as it is promptly pursued in some suitable manner. The Commission has made reference to ongoing investigations addressing segments of the challenged regulations, *Revision of Cable Television Rules, supra* note 17, 62 F.C.C.2d at 195; Brief for Respondent at 13, and these conceivably could serve the effort as far as they go. We say only that the Commission must reexamine the regulatory remnants of the

The order under review is vacated, and the case is remanded to the Commission for further proceedings in light of the principles articulated herein.

*So ordered.*

consensus agreement for some discernible contribution to the public interest, and we leave to the Commission in the first instance the procedures through which that will be done.