656 F.2d 910
 1981 O.S.H.D. (CCH) P 25,614
 CONSOLIDATION COAL COMPANY, Petitioner,
v.
Raymond J. DONOVAN, Secretary of Labor, United States
Department of Labor, and United States Department
of Labor, Mine Safety and Health
Administration, Respondents,
United Mine Workers of America, Intervenor,
Council of the Southern Mountains, Coal Employment Project,
and District 12, United Mine Workers of America,
Intervenors.
 No. 81-2016.
 United States Court of Appeals,
Third Circuit.
 Argued July 17, 1981.
Decided Aug. 13, 1981.
 
 Richard McMillan, Jr. (argued), Todd D. Peterson, Thomas C. Means, Crowell & Moring, Washington, D. C., for petitioner.
 T. Timothy Ryan, Jr., Sol. of Labor, Edward P. Clair, Acting Associate Sol., Michael A. McCord, Counsel, Appellate Litigation (argued), Edward C. Hugler, Acting Counsel, Coal Standards and Regulations, Nancy S. Hyde, Atty., U. S. Dept. of Labor, Washington, D. C., for respondents.
 Harrison Combs, Mary Lu Jordan (argued), Washington, D. C., for intervenor International Union, United Mine Workers of America.
 J. Davitt McAteer, Center for Law and Social Policy, Washington, D. C. (argued), Betty Jean Hall, Coal Employment Project, Dumfries, Va., Thomas B. Gumbel, United Mine Workers of America, Collinsville, Ill., for intervenors Council of the Southern Mountains, Inc., et al.
 Before ADAMS, HIGGINBOTHAM and VAN DUSEN, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 On June 12, 1981, Consolidation Coal Company (Consol) submitted a "Petition for Rulemaking" to the Secretary of Labor. It requested the Mine Safety and Health Administration (MSHA) to institute rulemaking procedures to amend the regulations governing the use of self-contained self-rescue devices (SCSRs), which provide oxygen to miners in the event of a mine fire or explosion. Consol desires an amendment which would approve its plans to develop an alternative SCSR capable of being worn on a miner's belt. Although MSHA has not yet acted definitively on Consol's petition for rule-making, Consol contends that this inaction is tantamount to a denial of its request, and it now asks this Court to review the agency's failure to convene new rulemaking proceedings. We conclude that we lack jurisdiction to entertain Consol's petition.
 
 I. The Regulatory Background
 
 2
 Underground mine fires and explosions generate noxious gases and deplete the oxygen in the area of such fires and explosions, and thus create a danger that miners will be asphyxiated.[1] The initial regulations promulgated to combat this problem required mine operators to supply filter-type self-rescuers to underground miners. 35 Fed.Reg. 17890, 17892 (Nov. 20, 1970). The filter devices proved inadequate, however, because they do not generate oxygen and because in the process of converting carbon monoxide to carbon dioxide they often render the air too hot to breathe. See 43 Fed.Reg. 54241-42 (Nov. 21, 1978). In 1970 the Bureau of Mines commenced an extensive program to test oxygen-generating SCSRs. Because these devices produce their own oxygen supply, a miner can survive for a significant period of time in an atmosphere polluted by toxic gases and depleted of oxygen. During the research and testing period at least two prototype SCSRs were developed and approved. The testing efforts culminated in rulemaking proceedings and in regulations that were promulgated on November 21, 1978. 43 Fed.Reg. 54241; 30 C.F.R. § 75.1714.-1714-3. Adopted under § 101(a) of the Mine Act, 30 U.S.C. § 811, which authorizes the Secretary to issue improved mandatory safety standards for the protection of miners, the regulations require operators of underground coal mines to provide miners with an approved SCSR device capable of supplying oxygen for at least 60 minutes. The 60 minute requirement is derived from § 317(n) of the Mine Act, 30 U.S.C. § 877(n):
 
 
 3
 A self-rescue safety device approved by the secretary shall be made available to each miner by the operator which shall be adequate to protect such miner for one hour or longer.
 
 
 4
 The operator may meet the SCSR requirement by providing an approved one-hour SCSR, an approved belt-worn SCSR that provided protection of not less than ten minutes duration combined with an approved one-hour canister (known as a 10/60 device), or any other approved self-contained breathing apparatus that provides at least one hour's protection. 30 C.F.R. § 75.1714-1. See also 43 Fed.Reg. 54241. The regulations stipulate that SCSRs should be worn by miners whenever possible but also allow SCSRs to be stored under the following conditions: (1) where the wearing or carrying of an SCSR is hazardous, it may be stored no more than 25 feet from the miner; (2) where a miner works on or around equipment, the SCSR may be placed in a readily accessible location on the equipment; and (3) when the MSHA District Manager has approved an operator's proposed storage plan after considering ten specific factors and "other matters bearing on the safety of miners." See 30 C.F.R. § 75.1714-2(c), (d), (e), and (f). The 1978 regulation also established a two-year phase-in period, and set December 21, 1980 as the implementation date. This two-year period was designed to give operators sufficient time to select, order, and supply the approved SCSRs, and to enable MSHA to conduct field evaluations of the currently approved and available devices. The 1978 regulations became effective on December 21, 1978, and no party sought to challenge them.
 
 
 5
 During the phase-in period unexpected delays hampered the field testing program. In addition, it became apparent that manufacturers had not produced a sufficient quantity of SCSRs to meet the original deadline.[2] Consequently, in December 1980 the Assistant Secretary for Mine Safety and Health determined that it was necessary to delay the implementation date for six months, to June 21, 1981, and he revised the 1978 rule accordingly, 45 Fed.Reg. 80501.
 
 
 6
 The Council of Southern Mountains, a group representing the health and safety interests of miners and an intervenor in the present dispute, challenged the procedural validity of the six month deferral in the United States Court of Appeals for the District of Columbia Circuit. Council of Southern Mountains v. Donovan, 653 F.2d 573 (D.C. Cir. Apr. 16, 1981). The American Mining Congress, an industry representative, intervened in those proceedings, and, as part of its argument in support of the extension, assured the court that the industry fully intended to comply by June 21, 1981. Id. at 583, n.41. Reasoning that the circumstances were sufficiently exceptional to excuse the Secretary's failure to follow the notice and comment procedures of the Administrative Procedure Act, and that the extension decision was neither arbitrary nor capricious, the District of Columbia Circuit upheld the 6 month deferral. It expressed regret, however, that the crucially important effort to equip miners with SCSRs was being prolonged, and rested its decision in part on the assurances from the parties that they would faithfully comply with the new June 21 deadline.
 
 
 7
 At the time the regulations were amended in December, 1980, all affected parties were aware which SCSRs were approved and commercially available. The safety advantages as well as the potential hazards of the approved devices were also well known. In addition, operators and miners were cognizant that the available SCSRs would in most cases have to be stored in the mines, because their size and weight made them too cumbersome to wear while working. In preparation for implementing the regulations, the Secretary had commissioned a private engineering firm to prepare guidelines for the storage of SCSRs, and the third draft of these storage guidelines was widely disseminated to all affected parties in October, 1980. Indeed, the lack of final storage guidelines may have been a factor in the decision to defer implementation of the SCSR rules until June 21, 1981. See CSM v. Donovan, supra, at 583.
 
 
 8
 The final storage guidelines were issued in June, and MSHA released the last version of the field evaluation tests at the same time. The evaluation report concluded that the currently available SCSRs were safe and reliable, and that miners would be able to comply with the regulatory requirement to wear, carry, or remain within 25 feet of an SCSR while working, although storage would be the rule, rather than the exception contemplated in 1978. The report also urged the continuation of research efforts to reduce the size and weight and to enhance the wearability of the SCSRs.
 
 
 9
 In preparation for the imminent implementation date, on June 8, 1981 MSHA sent enforcement policy memoranda to its district managers, who would be responsible for monitoring compliance with the SCSR requirements. One memorandum outlines criteria for the approval of storage plans under the provisions of 30 C.F.R. § 75.1714-2. Another offers guidance on when to issue citations, and explains that because of the small number of SCSRs actually produced to date, "operators will not be issued a citation where they show a valid purchase order or other reliable evidence of having ordered approved self-contained self-rescuers on or before June 21, 1981." (Joint Appendix at 590).[3]
 
 
 10
 As the June 21 implementation date drew near, Consol signed a letter of intent with Dr. Eliezer Kamon, a professor at Penn State University who had been studying the SCSR problem. The letter of intent, dated June 11, 1981, stated that Consol would commit $500,000 to the development of a belt-worn SCSR capable of providing a 30 minute oxygen supply, if MSHA amended or deferred the current regulations requiring 60 minute SCSRs, and if MSHA approved a 30 minute device.
 
 
 11
 The day after the letter of intent was signed, June 12, Consol filed its petition for rulemaking with the Secretary, requesting proceedings to inquire into the desirability of its proposed device. Dr. Kamon submitted an affidavit in support of the petition, in which he asserted that he believed he could develop a 30 minute belt-worn SCSR within ten months. The petition for rulemaking also assailed certain safety features of the approved devices, and contended that they contradicted the original intention of the 1978 regulation that SCSRs would be carried or worn, rather than stored. Consol represented to the Secretary that these safety concerns prompted its efforts to develop a belt-worn SCSR.
 
 
 12
 In light of the impending June 21 deadline, Consol requested the agency to act on its petition for rulemaking within five days. When five days passed without a response from MSHA, on June 19, Consol filed a petition for review in this Court.[4] The petition states that Consol seeks review of 30 C.F.R. § 75.1714 and "subsequent final agency action implemented" by MSHA "which, as interpreted by MSHA, require all mine operators to purchase (SCSRs) by June 21, 1981." The petition asserts that jurisdiction is based on Section 101(d) of the Mine Act, 30 U.S.C. § 811(d); Section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701-706; and the Fifth Amendment to the United States Constitution. Consol simultaneously moved for a stay of the SCSR regulation pending review by this Court. The Court held an emergency hearing on Consol's stay motion on June 19. We then denied the stay request but directed that the appeal be briefed and argued on an expedited basis. The SCSR requirement was implemented two days later, on June 21, 1981.
 
 II. Jurisdiction
 
 13
 Section 101(d) of the Federal Mine Safety and Health Act, 30 U.S.C. § 811(d), entitles "any person who may be adversely affected by a mandatory health or safety standard" to seek judicial review "at any time prior to the sixtieth day after such standard is promulgated." It would appear that to the extent Consol's petition for review challenges the 1978 SCSR regulation, it is clearly time-barred, since over two years have elapsed since 30 C.F.R. § 75.1714 was promulgated.
 
 
 14
 Consol contends, however, that its petition is timely, because the rule did not become ripe for review until MSHA issued the internal enforcement guidelines in June, which clarified the final effect of the regulation. Specifically, Consol asserts that it was not evident until June 1981 which SCSR devices would be approved, that storage would be the usual method of use, and that MSHA would not conduct further rulemaking to study plans for developing alternative devices.
 
 
 15
 To support its jurisdictional argument Consol draws our attention to Geller v. FCC, 610 F.2d 973 (D.C. Cir. 1979); Investment Company Institute v. Board of Governors, 551 F.2d 1270 (D.C. Cir. 1977); and Functional Music Inc. v. FCC, 274 F.2d 543 (D.C. Cir.), cert. denied, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 81 (1959). In these cases the District of Columbia Circuit has crafted a rule that:
 
 
 16
 Where the right to petition for review within 30 days after promulgation of a regulation does not provide an adequate remedy, alternative means may be utilized to bring a claim before this Court. Cf., Administrative Procedure Act § 10(b), 5 U.S.C. § 705 (1970). For example, if a regulation does not become ripe for review within 30 days, an aggrieved party can wait until sufficient information as to the regulation's concrete effect is available, petition the Board for reconsideration of the regulation on the basis of the new information, and seek review of the Board's decision in this Court.
 
 
 17
 Investment Co. Inst., supra, 551 F.2d at 1281.
 
 
 18
 Consol's reliance on Geller and Investment Company is misplaced for two reasons. First, the underlying regulation was ripe for review in light of Consol's objections either in 1978 or when it was amended in December, 1980. Moreover, the rule of Geller has been applied only when the agency has finally acted to deny the petition for reconsideration or further rulemaking, but here MSHA is still considering Consol's petition.
 
 
 19
 The factual predicates for the objections that Consol marshals against the SCSR regulation were known both in 1978 and in December, 1980. The regulation as promulgated in 1978 contemplated use of the SCSR devices that were available and approved at that time. These devices are the same SCSRs that operators must now order. We do not interpret the rule as "technology-forcing" in the sense argued by Consol. Although the notice in the Federal Register accompanying the 1978 rule expressed a hope that efforts to develop other devices would continue, it did not make final implementation contingent on the creation of new technology within the two-year phase-in period. Instead, the preamble to the regulation emphasized that the SCSRs then available were the approved devices that operators would have to procure and that "although no viable alternatives now exist to the approved self-contained self-rescuers, this regulation does not prevent use of improved devices." 43 Fed.Reg. 54244 (Nov. 21, 1978).
 
 
 20
 Consol's argument that the storage issue did not become ripe for review until June 1981 is also flawed. The unwieldly character of the approved SCSRs was known in 1978. Moreover, affected parties were well aware by October, 1980, at the latest, that the approved SCSRs would have to be stored, for at that time a third draft of the storage guidelines was disseminated. Yet no party challenged the storage aspect in the court proceedings that examined the rule as amended in December, 1980. The safety concerns surrounding the approved devices were also well known both in 1978 and in 1980, when some field testing results were available.
 
 
 21
 Contrary to Consol's assertion, the policy memoranda issued in June 1981 do not affect the ripeness of the underlying regulation. These internal agency documents simply provide guidance to enforcement personnel; they do not add substantive content to the SCSR regulation. Cf. United States v. Finley Coal Co., 493 F.2d 285 (6th Cir. 1974) (guidelines adding a coal dust clean-up program to existing requirements, and defining new terms connected with the new program, constituted revisions of a safety standard, and were therefore subject to judicial review). The guidelines for approving storage plans merely assist in implementing the previously known need for storage, and the enforcement memo advising that the placement of orders will constitute compliance adds no burdens or requirements to the operators' obligations as set forth in the 1978 rule. As the District of Columbia Circuit noted in Council of Southern Mountains, supra, it was understood at the time of the December 1980 amendments that "implementation does not mean every miner will be supplied with an SCSR on the critical date. Rather, once the regulations are implemented, mine operators will be impelled to supply whatever devices are available and order additional devices...." at 578, n.10.
 
 
 22
 The only new information that has developed since December is Consol's proposal to support Dr. Kamon's efforts to develop a 30 minute belt-worn SCSR. This information, however, has no impact on the concrete effect of the existing SCSR regulation, which does not preclude the development and later approval of innovative devices.
 
 
 23
 For the foregoing reasons, we conclude that 30 C.F.R. § 75.1714 was ripe for review when originally promulgated and when amended in 1980. Consol did not avail itself of the 60 day period permitted by 30 U.S.C. § 811(d) for seeking judicial review on either occasion, and it is now barred from levying objections in court against the desirability of the currently approved and available SCSRs.
 
 
 24
 As further support for its position that we have jurisdiction to entertain its petition, Consol argues, on the basis of Geller, that we may review MSHA's constructive "denial" of its petition for further rulemaking and for modification. Consol also relies on the recent District of Columbia Circuit decision in WWHT, Inc. v. FCC 656 F.2d 807 at 813 (D.C. Cir. 1981), for the proposition that an agency's denial of a petition for rulemaking normally is subject to judicial review.
 
 
 25
 The rationales of Geller and WWHT have force only after the agency has acted on a petition. Otherwise, there is no agency action for a court to review. MSHA is still examining both Consol's request for additional rulemaking and its application for modification, and we cannot say that the agency has effectively denied either request. On July 2, 1981, the Acting Deputy Assistant Secretary for Mine Safety and Health communicated by letter with Consol in regard to the petition for rulemaking. This letter pointed out that Consol had provided no substantive information upon which MSHA could initiate proceedings, because the affidavit describing the proposed device merely stated an opinion that the development was "feasible." "Consequently," the letter continued, "we are unable to assess the appropriateness or need to begin rulemaking at this time." The letter then urged Consol to submit additional information "to facilitate a meaningful decision as to amendment of the SCSR regulation." The MSHA official next advised Consol that the current SCSR rule would not require amendment to accommodate the use of the proposed 30 minute device, so long as it could be utilized in conjunction with another approved device to provide at least 60 minutes of oxygen. MSHA concluded its response by pledging its support for Consol's research efforts.
 
 
 26
 This letter demonstrates that MSHA desires to render a meaningful decision on Consol's petition, but that it needs further information before it can proceed on this course. Decisions on petitions for rulemaking from mine operators such as Consol are within the complete discretion of the agency. 30 U.S.C. § 811(c).[5] There is no indication that MSHA's deferral of a final decision on the petition is unreasonable or arbitrary. Consequently, Consol's petition for rulemaking is not ripe for review, and, since we lack jurisdiction we may not pass on whether MSHA should conduct proceedings to study Consol's proposed belt-worn SCSR.
 
 III. Conclusion
 
 27
 Providing adequate breathing devices to improve the likelihood that miners will survive underground explosions and fires is one of the most pressing safety needs facing the underground coal mining industry. Although the SCSRs now available are neither the perfect nor the final solution to the problem, all studies indicate that they represent a substantial improvement over the filter-type rescuers. Such a development, with its significant life-saving potential, must be hailed, despite its shortcomings. Similarly, we commend Consol for its expressed safety concerns and its announced intention to develop an improved SCSR. Although some may doubt the sincerity of the company's paramount concern for safety in light of its last-minute effort to stay the SCSR requirement and its continued insistence, in the face of contrary assurances from MSHA, that its research program cannot go forward under the current rule, it is expected that Consol will proceed with its research efforts. As MSHA has advised, Consol's proposal is not precluded by the existing SCSR regulation, so there are no foreseeable legal obstacles to carrying out the agreement with Dr. Kamon. Indeed, if Consol is able to produce a 30 minute belt-worn device, it is likely that such a device, when used in conjunction with a stored 60 minute SCSR, will provide an improved response to the breathing apparatus dilemma.[6] A miner would have the 30 minute SCSR readily accessible in the event of an emergency, which might provide an amount of oxygen sufficient to enable the miner to reach storage areas under even extreme conditions. The one hour oxygen supply from the stored device would then permit the miner to escape or to await rescue. Consol is to be encouraged to pursue vigorously its salutary efforts to produce a belt-worn SCSR. If these efforts come to fruition, Consol will have made an invaluable contribution to the enhancement of mine safety, a contribution that will in all likelihood be applauded by MSHA and organizations representing miners.
 
 
 28
 Consol's application for review of 30 C.F.R. § 75.1714 is untimely under 30 U.S.C. § 811(d), inasmuch as it was filed more than 60 days after the regulation became ripe for review; the company's requests for rulemaking and for modification are not ripe for appellate review because the agency has not yet acted on the petition for rulemaking; the petition for review will be dismissed for want of jurisdiction; and the mandate shall issue forthwith.
 
 
 
 [1]
 The National Academy of Engineering concluded that 22% of the 566 deaths from mine explosions or fires between 1950 and 1969 resulted from asphyxiation from smoke, carbon monoxide, or carbon dioxide. See Council of the Southern Mountains v. Donovan, 653 F.2d 573 at 576 (D.C. Cir. 1981). There is also evidence that of the 62 miners who died in mine disasters between 1970 and 1973, 12 succumbed from asphyxiation. Coal Age (May 1977), p. 51
 
 
 [2]
 Only 9000 SCSRs were available for delivery in December 1980. See Council of Southern Mountains v. Donovan, 653 F.2d 573 at 579, n.24 (D.C. Cir. 1981). As the D.C. Circuit noted, this number was woefully inadequate, since there are approximately 133,000 underground coal miners in the United States. Moreover, operators had been reluctant to place orders so long as there was a possibility of delaying the rule. As a result, the manufacturers lacked the incentive to increase production. Id
 
 
 [3]
 Most operators, including Consol, have now complied with the rule by placing purchase orders. At the time of argument, few SCSRs were actually available to miners, however. The possibility that the regulation might be stayed, left open by Consol's filing this action, apparently has made suppliers reluctant to commence large volume production. In addition, operators and manufacturers have been building escape clauses into their contracts, in the event Consol were to succeed in delaying implementation of the SCSR requirement. These escape clauses apparently have further delayed production and availability to miners. See Coal Outlook, June 29, 1981; Philadelphia Inquirer, June 21, 1981, at 15-A, col. 5
 
 
 [4]
 On the same day Consol also filed a petition for modification with the Secretary pursuant to Section 101(c) of the Mine Act, 30 U.S.C. § 811(c) (Supp. III, 1979). Section 101(c) provides that an operator may petition the Secretary to modify the application of any mandatory safety standard to a coal or other mine. This is permitted where the operator can provide the same measure of protection afforded by the standard through an alternative method or where application of the standard will diminish the safety of miners. Consol's petition for modification is currently under consideration on an expedited basis, at Consol's request
 
 
 [5]
 The Secretary argues that the discretionary nature of this decision precludes judicial review. He points out that under the format of § 811(c), he is not obligated to respond to or render a decision on an operator's petition for rulemaking. In WWHT v. FCC 656 F.2d 807 (D.C. Cir. 1981), the D.C. Circuit held that unless there is evidence of a "clear and convincing legislative intent to negate review," an agency's denial of a rulemaking petition is subject to judicial scrutiny. In light of our conclusion that there has been no agency action over which we can assume jurisdiction, we need not resolve whether MSHA's decision, when rendered, will be reviewable. We suggest, however, that manufacturers and operators not regard the distant possibility of further court action as an incentive to delay expeditious compliance with the vital SCSR safety regulation. See note 3 supra
 
 
 [6]
 Counsel for intervenors informed us at oral argument about European studies which demonstrate that a 90 minute oxygen supply may be necessary to insure adequate protection in most mine disasters